1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGE W. POPE, | ) CV F 99-5445 DLB P |
| Petitioner, | ) |
| | ) ORDER DENYING PETITION FOR WRIT OF |
| v. | ) HABEAS CORPUS |
| | ) (Document #1) |
| RANDOLPH L. CANDELARIA, Warden, | ) ORDER DIRECTING CLERK OF COURT TO |
| Respondent. | ) ENTER JUDGMENT |
| | ) |

        Petitioner is a state prisoner proceeding pro se with a Petition for Writ of Habeas Corpus

pursuant to 28 U.S.C. § 2254.  Pursuant to Title 28 U.S.C. § 636(c)(1), the parties have

consented to the jurisdiction of the United States Magistrate Judge.

        On September 12, 2002 the undersigned issued an Order denying Petitioner's Writ of

Habeas Corpus.  By Memorandum filed December 22, 2003 the United States Court of Appeals

for the Ninth Circuit vacated the Order Denying Petition for Writ of Habeas Corpus and

remanded the case to the undersigned with instructions to hold an evidentiary hearing.  The Court

of Appeals' Order stated "on remand, the district court should focus on the following: (1) Was

there a pre-trial conference where it was proposed that this statement be made?  (2) Who was

present at this conference, and who proposed use of the offensive word?  (3) Was Pope aware

beforehand that the statement would be made?  (4) Did Pope actually consent to use of the

specific offensive word?  (5) And if he did consent, was any such consent informed?"

1

1  (Memorandum page 3).  The Court of Appeals " . . decline[d] to reach Pope's additional claims
2  of ineffective assistance of counsel because the use of the offensive term so permeates the other
3  issues that it should be addressed as an initial matter." (Memorandum page 4).

4  On remand counsel was appointed to represent Petitioner and, after discovery was
5  conducted, an evidentiary hearing was held on May 27, 2004.  Petitioner appeared at the hearing
6  with counsel Ms. Carolyn Wiggin and Respondent was represented by Mr. Mark Anthony
7  Johnson.  Testimony was taken from Petitioner; David Liebowitz, Petitioner's attorney at trial;
8  Chris Gray; the prosecutor; Howard Broadman, the trial judge; and Jason Williams, a defendant
9  in another case tried by Ms. Gray.  The parties prepared and submitted supplemental briefs on
10  August 6 and September 7, 2004.

11  **FACTUAL HISTORY**

12  *Prosecution Case*

13  On July 7, 1995, Jacqueline Poe was standing in the check-out line at the R-N Market in
14  Tulare, California waiting to pay for her groceries when she saw a black man put some packages
15  of food down his pants. (RT 151).[1]  Poe, who is deaf, wrote a note stating, "I saw a black man
16  with a blue tank top that stole some meat[,]" and handed it to the cashier. (RT 152).  At trial, Poe
17  identified Petitioner as the man she saw put the packages of food in his pants. (RT 151-156).  She
18  also identified some photographs, taken by the store's security camera, as depicting the man she
19  saw put the packages in his pants.  Id.

20  Manyeung Fung, the Assistant Manager of R-N Market, heard on the store intercom that
21  someone had stolen some meat. (RT 23, 24).  He ran out of the store.  Id.  A store employee and
22  other persons pointed to Petitioner, who was wearing a tank top and stated that he had stolen
23  some meat. (RT 25).  Fung followed Petitioner across the street to a gas station. (RT 26).  At
24  first, Fung stated, Petitioner did not appear to have anything in his hands. (RT 28-29).  Then,
25  Fung saw that he had what appeared to be packages.  Id.  Fung approached Petitioner and asked
26  him to return what turned out to be two packages of lobster, two packages of fish, and one steak.

27

28  _____
[1]RT refers to the Reporters Transcript of the trial proceedings occurring on March 6, 7, and 8, 1996.

(RT 30).  Fung asked Petitioner to return the meat to him.  Id.  Petitioner stated that the packages

belonged to him and then said, "'You better let me go; otherwise somebody get hurt.'"  (RT 31,

35).  By this time several store employees had arrived on the scene.  Id.  Petitioner then shoved

the packages at Fung saying "You can have the meat[,]" and attempted to run away.  (RT 31, 32,

36, 43).  The packages bore the store label and the date and were still cold.  (RT 36-37).

Petitioner ran about 10 yards and then, Fung testified, Petitioner was on the ground.  (RT

33).  Fung could not tell whether Petitioner had tripped and fell or was tackled by store

employees.  (RT 33).  As Petitioner struggled, store employees held him down.  (RT 33).  At

some point, they allowed Petitioner to sit up.  (RT 31).  Petitioner then jumped up, hit one of the

employees in the mouth and again tried to run off.  (RT 34, 48).  However, several store

employees apprehended him and held him down until the police arrived.  (RT 34).

Tulare City Police Officer Thomas Salazar arrived at the gas station and saw Petitioner

lying on the ground.  (RT 115).  Several people were standing around him.  Id.  As the officer

handcuffed Petitioner, Petitioner screamed that his shoulder was broken.  (RT 115-116).  Officer

Salazar led petitioner to the patrol car and had him sit on the edge of the back seat, with the door

open. (RT 117).   Officer Salazar looked away for a moment and as he turned back toward the

police car, Petitioner fell out of the car onto the ground. (RT 117-118).  At about this time, other

police officers arrived.  Id.  Officer Salazar and another officer tried to pick Petitioner up off the

ground, but Petitioner had lodged his legs underneath the car.  (RT 119).  The officers eventually

succeeded in dragging Petitioner out from under the car and placed him in the patrol car.  (RT

120).  Officer Salazar then called for an ambulance.  Id.

When the ambulance arrived, Petitioner refused treatment and insisted that he be taken to

a hospital.  (RT 120).  Officer Salazar then drove Petitioner to the emergency room at Tulare

District hospital.  (RT 121).   The officer observed that Petitioner had a scratch on his back and

abrasions on both knees.  (RT 122).  A doctor examined Petitioner at the emergency room and

told Officer Salazar that Petitioner was not injured.  (RT 125-126).

Officer Salazar handcuffed Petitioner and led him back to the patrol car.  (RT 124).

When the officer turned away to unlock the door, Petitioner took off running and escaped.  (RT

1   125).  Petitioner was apprehended approximately three hours later.  (RT 125-126).

2   ***Defense Case***[2]

3       Petitioner testified that he went into the market with Toni Lyons, a woman friend. (RT

4   169).   Inside the market he met up with an "associate" of his, a black man named Charles Oliver.

5   Oliver asked Petitioner if his "friend [had] brought the car around."  (RT 169).  Oliver handed

6   Petitioner some packages of meat and fish and asked Petitioner to take them to his friend, Doug

7   Patterson. (RT 171).  According to Petitioner, Oliver stated "'Just take this and give it to my

8   partner.  It's cool.  I paid for it.'"  Oliver then indicated to Petitioner that he was going back into

9   the store to get some beer.  (RT 171).

10       Petitioner was acquainted with Patterson and familiar with his car.  (RT 172).  Petitioner

11   began looking for Patterson in the parking lot and walked across the street to the gas station. (RT

12   172).  At that point, Fung approached and demanded that Petitioner give the meat to him.  (RT

13   173).  Petitioner explained that someone else had paid for the packages but Fung accused

14   Petitioner of stealing the items.  (RT 173).  Petitioner was "shocked for a second."  Id.  He then

15   said "well, hell, if you want it, here, take the shit[,]" and "pushed it at him."  Id.

16       At that point, "[i]t got kind of crazy."  Somebody "grabbed [Petitioner] around the waist"

17   and "tackled [him] to the ground, more or less."  (RT 173).  Then, Petitioner testified, "as I was

18   on the ground, it was more and more started to come." Id.  Petitioner struggled but several people

19   held him down. Id.  Eventually, the struggle subsided and Petitioner sat up. (RT 174).  Seeing

20   what he thought was a chance to get away from his attackers, Petitioner jumped up and shoved

21   Davis out of the way. (RT 175).  Petitioner stated that he intended to go back into the store to

22   confront Oliver.  (RT 175).

23       At trial, Petitioner was shown the security photos and denied that the person depicted in

24   the photos was him.  (RT 176).  Petitioner also admitted that he resisted Officer Salazar and

25   "played on his generosity" (RT 178) because he knew him and thought he might get another

26   chance at getting away.  (RT 192).

27

28       [2]The case for the defense was taken from Petitioner's testimony unless otherwise stated.

1          **PROCEDURAL HISTORY**[3]

2          On March 7, 1996, the Tulare County District Attorney's office filed an amended

3   information charging Petitioner in Count 1 with petty theft with a prior conviction (California

4   Penal Code § 666)[4], in Count II with dissuading a witness by force or threat (§ 136.1(c)(1)), in

5   Count III with misdemeanor battery (§ 242), and in Count IV with resisting a police officer (§

6   148).  The information further alleged in Counts I and II that Petitioner had suffered four prior

7   convictions within the meaning of § 1170.12(c)(2)(A), and had served three prior prison terms

8   within the meaning of § 667.5(b).  That same day, Petitioner was arraigned, pled not guilty, and

9   denied all allegations.

10         On March 7, 1996, a jury was impaneled to try the case.  On March 8, 1996, the trial

11  court granted Petitioner's motion to dismiss the dissuading a witness charged in count II.  That

12  same day, the jury found Petitioner guilty on the remaining counts and found true each of the

13  prior conviction and prison term allegations.

14         On March 27, 1996, Petitioner moved to strike the prior convictions.  On August 5, 1996,

15  Petitioner moved for a new trial.  The Court denied both motions on August 9, 1996.

16         That same day, the trial court denied probation and sentenced Petitioner to state prison for

17  25 years to life, less 600 days for time served and statutory credit.  The trial court ordered the

18  prior prison term enhancements be stricken and ordered Petitioner to pay a $5,000 restitution fine

19  pursuant to § 1202.4.

20         Thereafter, Petitioner appealed his conviction to the California Court of Appeal, Fifth

21  Appellate District.  In an unpublished opinion filed on September 8, 1997, the Court of Appeal

22  affirmed the conviction.

23         On or about October 16, 1997, Petitioner filed a Petition for Review in the California

24  Supreme Court.  Petitioner also filed a Petition for Writ of Mandate on October 30, 1997.  On

25  December 23, 1997, the California Supreme Court denied review and denied the Petition for Writ

26

27         [3]The following procedural background was taken from Respondent's Answer.

28         [4]All further references are to the California Penal Code unless otherwise indicated.

of Mandate.

On October 1, 1998, petitioner filed a Petition for Writ of Habeas Corpus in the California Supreme Court. The California Supreme Court denied the Petition on March 31, 1999.

Petitioner filed the instant federal Petition for Writ of Habeas Corpus on April 6, 1999. On June 15, 1999, the Court ordered Respondent to submit a Response addressing the merits of the Petition. Respondent submitted an Answer on September 13, 1999. Petitioner filed his Traverse on October 15, 1999.

On June 21, 2001, the Court ordered Respondent to provide further briefing and supporting documentation. The briefing and documentation was provided to the Court on August 20, 2001.

On September 12, 2002 this Court issued its Order Denying Petition for Writ of Habeas Corpus and on September 16, 2002 Judgment Denying the Writ was entered.

On December 22, 2003 the Ninth Circuit Court of Appeals issued its Memorandum of Order vacating the Judgment and Order Denying Petition for Writ of Habeas Corpus and Remanded the Writ with instructions to hold an evidentiary hearing to augment the record.

## DISCUSSION

### Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 120 S.Ct. 1495, 1504 fn.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Tulare County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 2241(d). Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997), *cert. denied,* 522 U.S.

6

1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (*quoting*

Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct.

1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

(1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

Petition was filed after the enactment of the AEDPA.  Thus, the Petition is governed by its

provisions.

**Standard of Review**

  This Court may entertain a Petition for Writ of Habeas Corpus "in behalf of a person in

custody pursuant to the judgment of a State court only on the ground that he is in custody in

violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

  The AEDPA altered the standard of review that a federal habeas court must apply with

respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v.

Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA an application for habeas corpus

will not be granted unless the adjudication of the claim "resulted in a decision that was contrary

to, or involved an unreasonable application of, clearly established Federal law, as determined by

the Supreme Court of the United States;" or "resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the State Court

proceeding." 28 U.S.C. § 2254(d); See, Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000); Van

Tran v. Lindsey, 212 F.3d 1143, 1153-54 (9th Cir. 2000) (defining "unreasonable application" as

involving situations where the state court has committed clear error).

  While habeas corpus relief is an important instrument to assure that individuals are

constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392

(1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a

criminal conviction is the primary method for a petitioner to challenge that conviction.  Brecht v.

Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's

factual determinations must be presumed correct, and the federal court must accept all factual

findings made by the state court unless the petitioner can rebut "the presumption of correctness

by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115

7

1  S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day,

2  110 F.3d 1380, 1388 (9th Cir. 1997).

3  **Claims for Relief**

4        ***Prosecutorial Misconduct***

5        Petitioner contends that the Prosecutor misstated the evidence during closing and also

6  made improper comments regarding petitioner's failure to call a defense witness.  (Petition at 5).

7        To establish prosecutorial misconduct, a petitioner must demonstrate that the prosecutor's

8  closing "so infected the trial with unfairness as to make the resulting conviction a denial of due

9  process." Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464 (1986) (*quoting* Donnelly v.

10  DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868 (1974)).  Any claim of prosecutorial

11  misconduct must be reviewed within the context of the entire trial.  Id. at 765-66, 107 S.Ct. at

12  3109; United States v. Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1994).  The court must keep in

13  mind that "[t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct

14  is the fairness of the trial, not the culpability of the prosecutor" and "the aim of due process is not

15  punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the

16  accused." Smith v. Phillips, 455 U.S. 209, 219, 102 S.Ct. 940, 979 (1982).  Thus, "[i]mproper

17  comment warrants reversal only if it appears that the comment may possibly have affected the

18  verdict." Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir.1987).

19                **Comments on photographs**

20        A prosecutor may make inferences during closing argument that is based on the evidence

21  in the record; however, he cannot misstate or exceed the evidence in any significant respect.

22  United States v. Marques, 600 F.2d 742, 749 (9th Cir. 1979).

23        While on the witness stand, Ms. Poe identified herself and the Petitioner in all but one

24  photo where the perpetrator had exited the store.  (RT 152-156).  The photos were then entered

25  into evidence and given to the jury during deliberations. (RT 163).  During closing argument, the

26  Prosecutor referred to the photographs and noted that the photographs, although not clear, were

27  consistent with what Ms. Poe testified she had witnessed in the store.  (RT 265-266).  The

28  prosecutor further noted that in the event that the jury found the pictures to be problematic, the

jury could simply "throw them out" because Ms. Poe's testimony as to what she witnessed take place in the store was also evidence which the jury could validly consider.  (RT 267).

A thorough review of the record convinces the Court that the prosecutor's comment was neither inappropriate nor an incorrect statement of the evidence.  As such, the commentary did not constitute prosecutorial misconduct and Petitioner's claim fails.

### Comments on Petitioner's failure to call exculpatory witnesses

Petitioner also alleges that the Prosecution committed misconduct by referencing the defense's failure to call as a witness the woman Petitioner claimed he accompanied to the store.

"A prosecutor's comment on a defendant's failure to call a witness does not shift the burden of proof, and is therefore permissible, so long as the prosecutor does not violate the defendant's Fifth Amendment rights by commenting on the defendant's failure to testify." United States v. Cabrera, 201 F.3d 1243, 1250 (9th Cir.2000); United States v. Vaandering, 50 F.3d 696, 701-02 (9th Cir.1995) (holding that a prosecutor's comments highlighting the weaknesses in the defendant's case did not shift the burden of proof because the prosecutor did not comment on the defendant's failure to testify, and expressly told the jury that the government bore the burden of proof) (citing United States v. Mares, 940 F.2d 455, 461 (9th Cir.1991)); United States v. Williams, 990 F.2d 507, 510 (9th Cir.1993).

In this case, Petitioner himself testified that Toni Lyons accompanied him to the R-N Market on the day of the charged offense. (RT 169).  However, the defense did not present evidence to support his testimony.  The government, during closing argument, merely called attention to the defense' failure to present corroborating testimony.  A review of the record reveals that no commentary by the prosecution was made with respect to Petitioner's Fifth Amendment right not to testify. Thus, no violation of his Fifth Amendment occurred.  In fact, Petitioner *did* testify

### *Trial Court's Abuse of Discretion*

Petitioner next contends that the trial court's use of the word "nigger" during *voir dire* constituted an abuse of discretion.  Petitioner claims that the trial court's use of this vile and offensive word, even for the purpose of attempting to ferret out bias on the part of prospective

jurors, so infected his trial with racial bias as to deny him a fair trial in a fair tribunal and due

process. (Petitioner's Post Evidentiary Hearing Brief at 39).

It is doubtful that there is any other word in the English language which carries such

powerful hateful affect as the word "nigger."  The word alone conjures up memories, all too

recent, of the total and inhumane oppression of Africans and African-Americans at the hands of a

nation which was founded on the principle that "all men are created equal" and whose citizens

profess to love freedom above all else.  It reminds us of hundreds of years of slavery, of

lynchings, and a legacy of discrimination and unequal treatment.

### Trial Record of *Voir Dire*

The transcript of the *voir dire* conducted in Mr. Pope's trial reveals that then Judge

Broadman used the offensive word as follows:

First in addressing the venire.

THE COURT: . . .  Here's the bottom line of this questioning.  I will never know whether or not you will be a fair juror.

It's illegal, its's immoral, and it's wrong for you to lie.  But you folks are the only people who can tell me whether or not you can be a fair juror.

And if you can't be a fair juror - - let's assume that you're racially biased against this man because he's black, and you don't like black people.  And I will tell you that has happened a number of times.  So you can't be fair to this guy because he's black.

Mr. Lebowitz approach the bench, would you.  Counsel.

(Off the record discussion.)

THE COURT: Pursuant to agreement by the defendant, I want you to be so in touch with your racial biases that I'm going to say some pejorative terms.

If you believe - - in these pejorative terms - - pejorative means negative terms.  I am not going to yell at you.  I'm not going to criticize you.  I'm not going to do anything to you except say thank you very much.

But almost all of you over there are white.  He's black.  There are those of you who may think that this is just some nigger who was stealing food, and he's a crook.  And he's a nigger.

If you think that way, it's okay, raise your hand, and you're out of here. Be courageous.  Be courageous.  Don't hide your racial prejudice.

The last time I asked that question, I lost a tremendous amount of jurors. It was a rape case.  And there was a rape of a white woman or a Mexican lady, I

1    can't remember.  And I lost a lot of jurors.  But I had a fair trial jury.

2         If you think this is some nigger who's out causing crimes, raise you hand
     and you can go home.

3         In the gallery, anyone want to - - sir, your name?

4         A JUROR: (Name).

5         THE COURT: Thank you, (name).  Go back down to the jury assembly
     room.  I appreciate you honesty and you integrity.

6
         (Name) had courage.  That's a very difficult thing (name) just did.

7
         Anybody else?

8
         Go into your brain.  I saw a couple tears in the jury gallery when I said
9    that.  Okay.

10        By the same token, just because he is an African-American does not mean
     that you can favor him.

11
         Is there anybody over here who believes that because he's an African-
12   American that he should be favored and given special - - he's had a tougher life
     because he's black or something like that, and, therefore, we should cut some
13   slack here?

14        It's okay.  There's no wrong answers.  Only honest answers.

15        Anyone think that?  Okay.

16        Tough questions.  Hard questions.

17        I'll tell you a funny story.  The last time I asked that question, the lady - -
     the defendant's mother thought that I was calling him a nigger, and she was so
18   mad at me that I won't ask that question anymore without getting permission.

19        And I do that because I want to bring out - - I want to get down to the base
     feeling that everybody has about race.
20
         Do you track me on that, (No. 217)?
21
         A JUROR: Yes.
22
         THE COURT:  Does it make sense to you?
23
         A JUROR:  It makes sense.
24
         THE COURT: Does it offend you?
25
         A JUROR: Not at all.
26
         THE COURT: Okay.  Who do you know in law enforcement, (No. 178)?
27
     People v. Pope, No. 36477.  Reporter's Transcript (March 6 and 7, 1996) [RPT] page 19 line 23
28

11

1   to page 22 line 22.

2       Second, in addressing an individual prospective juror in open court.

3           THE COURT: (No. 224).

4           A JUROR: (No 224.)

5           THE COURT: (No. 224).  Did you reach a verdict?

6           A JUROR: Yes.

7           THE COURT: Your were the one with the tear.

8           A JUROR: Oh.

9           THE COURT:  I don't mean to embarrass you, but I'd like for you to fill
10  in the blank for me.

11          A JUROR: Excuse me?

12          THE COURT: I don't mean to embarrass you, but I'd like you to fill in the
    blank.  I thought I saw a tear.

13          A JUROR: Well, I just don't like that language.

14          THE COURT: Do you understand the reason for it?

15          A JUROR:  Oh, yes.

16          THE COURT: It's not a word I use either.  In fact, the only times I've ever
17  used it in my recent memory were in jury selection.  But you understand we come
    from - - in this community there are a number of people who are racist.

18          A JUROR: Uh huh.

19          THE COURT: The best - - if I say to you - - let's assume you're racist.  If I
20  say to you can you be fair in this case, what are you going to tell me?

21          A JUROR: No.

22          THE COURT: If you're a racist, you're going to tell me yes, because
    you're not wanting to admit you're a racist because it's too embarrassing.  But if I
    get to your gut by using the N word, I'm more likely to get a visceral response that
23  you'll respond to.  That's why I use it.  Do you understand?

24          A JUROR: I understood why you were using it.  I just didn't care for it.

25          THE COURT: Okay.  That's fair.  But I was defending my self right then.

26          A JUROR: Oh.

27          THE COURT: Okay.  You know, I get in enough trouble anyway.  So
    when I get in trouble, I like to present my defense in the same transcript rather
28  than having to go to other places.

(RPT page 33 line 11 to page 35 line 3).

Finally, in addressing the venire on the second day of *voir dire* after additional prospective jurors were added to the venire.

THE COURT: Okay. A couple of points. Here's the tough one. And I'm not unmindful of the fact that there is a black man in the audience. And I want you to know that I have addressed this issue with the defendant.

And I address this issue with you because I need a fair jury. And I need a fair jury - - and there is a lot of racism in the world. If you think this is a nigger who did a crime, thank you for coming today, but you get to go home. It's very difficult to admit to that because it's not societally (sic) acceptable.

It's a horror if you think that way in this case and you don't say, judge, I need to leave.

Yesterday, I only had one person leave. The last time I had a black defendant, I had about 30 percent of the people say I cannot be fair in this case.

So he's charged with a crime. It's a stealing of some meat from a market. And if you just think - - you know, why did I use the term nigger? It's not in my vocabulary. It's in a lot of other people's vocabulary. I want it to hit home with you one hundred percent. And I need you to stand up and tell me if you think this is just some nigger who's doing a crime. Be courageous. Don't sit back there and say I don't fell the way, but you really do. Okay.

By the other side of that question, I need to know whether any of you are going to say I'm going to give this guy a break because he's oppressed because he's a black man or a nigger. And if you feel that way, you can't be on this jury either, okay. Do any of you feel that way? Please stand up. And I won't call your name out, I promise.

Did you ever think that you'd be called in to jury duty to be asked these questions? Do you see why I must ask these questions in order to get a fair jury?

So on those two questions, and it can be either way, here's your way out. You can either think that he's a nigger who does crimes, and I can't be fair, or you can say he's an oppressed man, and I'm gonna cut him some slack because of that.

If you think either of those, stand up, and I won't ask you which one it is. So you get to get out of this case without us knowing whether you're a racist or not a racist.

Anybody - - anyone got the courage to stand up and face that reality? Okay.

RPT page 116 line 4 to page 118 line 1.

## **Evidentiary Hearing Factual Findings**

At the evidentiary hearing Mr. Liebowitz, Ms. Gray and Judge Broadman differed as to the details of the pretrial conference where the use of the word "nigger" was discussed. For

1   example, they didn't agree whether the discussion occurred in chambers or in the courtroom.

2   However, all three testified unequivocally that: (1) it was discussed; (2) Judge Broadman was the

3   one who suggested the word be used in voir dire in order to encourage the prospective jurors to

4   examine and admit to any racial prejudices they might harbor; (3) Mr. Pope was present during

5   the discussion and personally consented to the use of the word.  Mr. Pope on the other hand was

6   certain that he was never a party to a pretrial conference concerning the use of the word "nigger"

7   and that he did not and would not have consented to its use in *voir dire.*

8        Based upon the record and the testimony and exhibits received at the evidentiary hearing

9   the court finds that:

10           1.  There was a pre-trial conference where it was proposed that the word in

11   question be used in *voir dire* in order to get jurors who were racially prejudiced to admit they

12   were biased[5].

13           2.  At least Mr. Pope, Judge Broadman, Mr. Liebowitz and Ms. Gray were present

14   at the pre-trial conference where the use of the word at issue was suggested.  It was Judge

15   Broadman who suggested the use of the term and he indicated he had used it in at least one

16   previous case where it had been effective in encouraging people to admit their biases.

17           3.  Because he was present and participated in the pre-trial conference Mr. Pope

18   was aware that the word would be used in *voir dire.*

19           4.  Mr. Pope consented to the use of the specific offensive word both at the time

20   of the pre-trial conference and in court during *voir dire* immediately before Judge Broadman

21   used the word.

22           5.  Neither Mr. Pope nor Mr. Liebowitz were aware of exactly what Judge

23   Broadman would say or how he would use the term in *voir dire.*  They were aware that he would

24   use it in an attempt to encourage prospective jurors to admit any racial biases.  Mr. Pope was

25   aware and was expressly told by Judge Broadman that he would not use the word unless Mr.

26

27           [5] By including in the finding of fact the purpose with which the statement was made, the court does not
28   agree that it was appropriate or effective, but only finds that this was Judge Broadman's state of mind and intent in
using it.

Pope agreed that he should.  Mr. Liebowitz testified that he was not in agreement but that Mr. Pope wanted to do it anyway.  There is no evidence that Mr. Liebowitz and Mr. Pope had a discussion of any length about the advisability or effectiveness of using the offensive word.

Several factors lead the court to find, contrary to Mr. Pope's testimony that he was present at the pre-trial conference and consented to the use the offensive word.

First, Judge Broadman had used the term before in *voir dire* in the trial of *People v Hooks* and while he used it the first trial in that case which resulted in a hung jury he refrained from using it in the second trail because the defendant and his mother objected.

Second, the use of the offensive word was unusual, even for Judge Broadman who was not known for his orthodoxy, and one could expect that an experienced judge, prosecutor and defense attorney would insist on the defendant's consent and to recall whether consent was given.

Third, the record of the *voir dire* is consistent with the Petitioner having given his consent.  Prior to using the offensive word Broadman called counsel to the bench to confirm that Mr. Pope was still in agreement with its use.  Judge Broadman told the prospective jurors, more than once, that he was using the term with the specific agreement of the defendant.  He stated in *voir dire* that based upon his experience in the *Hooks* case and that he would only use the term with the agreement of the defendant.

Finally, at the conclusion of the first day of *voir dire* there was a discussion about the process of jury selection between Broadman, Liebowitz, Gray and Pope.  Petitioner expressed himself freely during this discussion and although he expressed concerns to the judge about whether he had asked questions about race to a particular juror he never mentioned or objected to the use of the offensive term.  (RPT page 111 line 10 to page 114 line 15.)

### **Discussion**

The Sixth Amendment guarantees that all criminal defendants will be afforded a trial by an impartial jury.  U.S. Const. Amend. VI.   An accusation that a judge conducted voir dire in a way that denied Petitioner's Sixth Amendment right to a fair and impartial jury is reviewed for abuse of discretion. <u>Rosales-Lopez v. United States</u>, 451 U.S. 182, 101 S.Ct. 1629 (1981)

(applying an abuse of discretion standard to the trial judge's decision whether to ask potential jurors about racial bias during voir dire); U.S. v. Cutler, 806 F.2d 933, 936-37 (9th Cir.1986).  A trial judge "retains great latitude in deciding what questions should be asked on voir dire." Mu'Min v. Virginia, 500 U.S. 415, 424 (1991).

The U.S. Supreme Court has held that in order to ensure the accused the right to an impartial jury, the Fourteenth Amendment requires that where a defendant is charged with a crime against an individual of a different racial group, inquiry must be made into racial prejudice of the potential jurors. Mu'Min v. Virginia, 500 U.S. 415, 424 (1991).  Thus, it was incumbent on the court to inquire into the potential racial bias' of the jury pool.

Judge Broadman clearly stated to Petitioner, counsel and the prospective jurors that the statements were made in an effort to weed out potential jurors with bias against African Americans.  As Petitioner himself states, the judge invited "all racists to openly identify themselves in open court without the benifit [sic] of sheets."  The judge's statements could not reasonably have been interpreted to indicate he harbored racial bias or that he encouraged, condoned or would permit it from the jurors.  However misguided the statements may have been this was not done to encourage racism as Petitioner contends, but to identify and remove potential jurors who might seek to convict Petitioner on the basis of his race - in other words, in an effort to protect Petitioner's right to an impartial jury.  In fact the statements led to the removal of a least one juror who responded to the judge's questioning.  There is no evidence that any of the jurors were motivated by racial bias.

The Court finds the trial judge's comments did not violate Petitioner's Sixth Amendment right to an impartial jury and due process under the Fourteenth Amendment.  Accordingly, his claim is DENIED.

### Miscarriage of Justice - jury notes

Petitioner states that while he was on the stand, the jury gave a note to the judge and that the judge looked at the note "with disgust."  The judge then gave the note to the prosecutor and defense counsel but the notes did not appear in the record for appeal purposes nor were they given to his appellate attorney.  Petitioner continues that he has "the right to index the minds of

1   the jury" and that the notes were destroyed and not given to him for purposes of appeal. (Petition
2   at 6).  As such, Petitioner alleges, he was denied his Sixth Amendment right.

3       At the commencement of trial, the trial judge informed the jury that they could ask
4   questions by submitting them in written form to the bailiff. (RT 15).  The judge informed the jury
5   that the reason he would proceed in this way was because a question might be objectionable and
6   neither party would want to offend the jury by objecting to a question posed by them. (RT 15).
7   Later, during the testimony of Mr. Fung, the first witness called to the stand, the jury submitted a
8   written question to the bailiff.  (RT 45).   On the record, the judge stated "What's just happened,
9   ladies and gentlemen, is one of you have sent me a question.  What I do is I don't ask the
10  questions.  My philosophy is that the lawyers try the case.  I've given them the question.  If they
11  think its appropriate, they'll ask it."  (RT 45).

12      Petitioner does not complain that the jury's questions during trial were not given to the
13  defense, his contention is that the notes were not made part of the record for the purposes of
14  appeal.

15      The California Court Rule that governs the contents of the record on appeal from
16  judgment provides that if the appeal is taken by the defendant, "the reporter's transcript shall also
17  contain . . . (e) closing arguments to the jury, comments on the evidence by the court before the
18  jury, and all communications to and from the jury *after instructions have been given* whether or
19  not denominated as questions or instructions."  California Rule of Court 33(a)(2).   In this case,
20  the questions to which Petitioner claims entitlement were submitted prior to the giving of jury
21  instructions.  Thus, under the California Court Rules, they were not part of the record for the
22  purposes of appeal.  Moreover, as noted by Petitioner, the questions submitted by the jurors were
23  given to both parties during the course of the trial.  Had either the Prosecution or the Defense
24  found the questions to be relevant, such questions would have been asked and as a result, would
25  necessarily become part of the record.  The fact that Petitioner does not know exactly which of
26  the questions asked during the entire course of the trial were questions submitted by the jury does
27  not rise to the level of a constitutional violation.

28      Petitioner's only justification for having these notes is his belief that he has a right to

1    "index the minds of the jury."  However, Petitioner enjoys no such right under the Constitution.

2    The rule of secrecy is fundamental to the effective operation of the jury system.  In order for the

3    process to work, jury participants must feel completely free to dissect the credibility, motivations,

4    and just desserts of other people.  Sensitive jurors will not engage in such a dialogue without

5    some assurance that it will never reach a larger audience.  To use jurors' notes to impeach a

6    verdict would, as the Supreme Court in McDonald v. Pless feared, "make what was intended to

7    be a private deliberation, the constant subject of public investigation--to the destruction of all

8    frankness and freedom of discussion and conference."  McDonald v. Pless, 238 U.S. 264, 267-

9    268, 35 S.Ct. 783, 784 (1915).  Although the notes were submitted prior to jury deliberations, the

10   Court finds the policy reasons for protecting jury deliberations equally applicable.

11          In the instant case, Petitioner provides no explanation or facts in support of his assertion

12   that the lack of notes in the record constituted a violation of his right to an impartial jury.

13   Petitioner does not allege in anyway that his jury was impartial.  Thus, obtaining the notes would

14   only serve to bolster or formulate new challenges to the conviction.  Petitioner's concerns

15   regarding the questions asked by the jury are easily allayed by the fact that if asked, the question

16   necessarily became part of the record - a record that was available to Petitioner on appeal.

17   Accordingly, the claim is DENIED.

18          ***Self-Incrimination - Petitioner's right not to testify***

19          Petitioner contends that the trial court committed error in failing to advise Petitioner of

20   his right not to testify.

21          An accused's right to testify is a constitutional right of fundamental dimension guaranteed

22   by the Sixth Amendment. See, Rock v. Arkansas, 483 U.S. 44, 51-53 (1987); United States v.

23   Edwards, 897 F.2d 445, 446-47 (9th Cir. 1990) (*applying* United States v. Martinez, 883 F.2d 750

24    (9th Cir.1989), *vacated on other grounds*, 928 F.2d 1470 (9th Cir.), *cert. denied,* 111 S.Ct. 2886

25   (1991)), *cert. denied,* 111 S.Ct. 560 (1990).  Because the right is personal, it may be relinquished

26   only by the defendant. United States v. Martinez, 883 F.2d 750, 756 (9th Cir. 1989).  The trial

27   court, however, "'has no duty to advise the defendant of his right to testify, nor is the court

28   required to ensure that an on-the-record waiver has occurred.'" United States v. Edwards, 897

18

1   F.2d 445, 446 (9th Cir. 1990) (*quoting* U.S. v. Martinez, 883 F.2d , 750, 760 (9th Cir. 1989)).  It is

2   primarily the responsibility of the defendant's counsel, not the trial judge, to advise the defendant

3   on whether or not to testify and to explain the tactical advantages and disadvantages of doing so.

4   United States v. Wagner, 834 F.2d 1474, 1483 (9th Cir.1987).  "[I]t would be inappropriate to

5   require the trial court to discuss this choice with the defendant.  Such a requirement would

6   unnecessarily intrude into the attorney-client relationship and could unintentionally influence the

7   defendant in his or her choice." Id. at 1483.

8           In the instant case, Petitioner concedes that a discussion as to whether or not Petitioner

9   should testify took place between he and his attorney.  Although Petitioner states he did not want

10  to testify, he states that he "didn't object."  (Petition at 7).  It is presumed that Petitioner's

11  appearance on the witness stand was an assent to his attorney's tactical decision to have

12  Petitioner testify.  Had Petitioner been strenuously opposed to his testifying as he contends, he

13  could have insisted to the Court that he not be required to testify or moved to discharge his

14  attorney.  However, this did not occur.  Petitioner's lament at having testified can be ascribed

15  only to him as the trial court is under no obligation to advise Petitioner in this regard.

16  Accordingly, his claim that the trial court erred by not advising Petitioner of his Fifth

17  Amendment Right regarding his testimony is DENIED.

18          ***Ineffective Assistance of Counsel - Failure to call Exculpatory Witness***

19          Petitioner argues that his trial counsel was ineffective because he failed to call an

20  exculpatory witness due to a conflict of interest the potential witness.  Petitioner claims that one

21  Mr. Oliver, an "acquaintance"of Petitioner, gave him the meat outside the store, said he had paid

22  for it and asked Petitioner to deliver the meat to a friend waiting in a nearby car.  According to

23  Petitioner, his attorney represented a client against whom Mr. Oliver testified.  While on the

24  stand, Counsel called Mr. Oliver the "scum of the earth" and was fined fifteen hundred dollars

25  ($1500.00).  Thus, Petitioner concludes, counsel would not call Mr. Oliver as a witness on

26  Petitioner's behalf.  Petitioner states that Mr. Oliver was willing to testify that it was he, and not

27  Petitioner, who stole the meat.  In support of this claim, Petitioner has submitted an affidavit

28  purportedly from Mr. Oliver in which Mr. Oliver takes responsibility for the theft.

Ineffective assistance of counsel is based on the Sixth Amendment right to counsel, which exists "in order to protect the fundamental right to a fair trial." Lockhart v. Fretwell, 506 U.S. 364, 368, 113 S.Ct. 838 (1993) (*quoting* Strickland v. Washington, 466 U.S. 668, 684, 104 S.Ct. 2052 (1984)).  A claim for ineffective assistance must meet the two-part test advanced by the Strickland court.  First, petitioner must show that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.  Second, [Petitioner] must show that the deficient performance prejudiced the defense.  This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial [or in case, appeal] . . . whose result is reliable." Strickland v. Washington, 466 U.S. 668, 668, 104 S.Ct. 2052, 2066 (1984).  More precisely, Petitioner must show that (1) his attorney's performance was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different.

It is important to note that a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.  Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984).  Since it is necessary to prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

"To establish a sixth amendment violation based on a conflict of interest, a defendant must show that (1) that counsel actively represented conflicting interests, and (2) that an actual conflict of interest adversely affected his lawyers performance." Cuyler v. Sullivan, 446 U.S. 335, 350 (1980).  Petitioner must prove an actual conflict "through a factual showing on the record." Morris v. California, 966 F.2d 448, 455 (9th Cir. 1992).  Petitioner must also show that the conflict likely had an adverse effect on the representation.

In the instant case, Petitioner does not assert and there is nothing in the record to indicate that counsel ever represented Mr. Oliver.  Thus, there is no evidence whatsoever that counsel preferred Mr. Oliver's interests over Petitioner's or that counsel had divided loyalties sufficient to constitute a conflict of interest.  Accordingly, the assertion that there existed a conflict of interest is without merit.

1    To the extent Petitioner alleges ineffective assistance for not having called Mr. Oliver as a

2    Witness, irrespective of a conflict of interest, the Court finds no merit to the claim.

3        To warrant habeas relief, the defendant must show that the state court applied federal law

4    to the facts of his case in an "objectively unreasonable manner." Bell v. Cone, --- U.S. ----, ----,

5    122 S.Ct. 1843, 1852 (2002).  When considering whether counsel's performance was deficient,

6    the Court is highly deferential to counsel's performance, indulging a presumption that "under the

7    circumstances, the challenged action might be considered sound trial strategy." Bell v. Cone, ---

8    U.S. ---, 122 S.Ct. 1843, 1852  (2002).   Of course, "state court findings of fact made in the

9    course of deciding an ineffectiveness claim are subject to the deference requirement of [28

10   U.S.C.] 2254(d)," Strickland, 466 U.S. at 698, 104 S.Ct. at 2070, and are presumed to be correct

11   unless they fall within one of the eight exceptions listed in 28 U.S.C. § 2254(d).[6]

12       Here, the trial court held a hearing regarding a Motion for New Trial on the basis that

13   counsel was ineffective for not having called Mr. Oliver despite Petitioner's assertion that Mr.

14   Oliver would have confessed to stealing the meat.  A review of those proceedings reveals that

15   trial counsel's not having called Mr. Oliver was the result of a reasoned tactical decision.

16   Strickland, 466 U.S. 668, 691, 104 S.Ct. 2052, 2066 (1984); Guam v. Santos, 741 F.2d 1167,

17   1169 (9th Cir.1984) (reasoned tactical decisions cannot form the basis of an ineffective assistance

---

[6]Those exceptions apply if the petitioner establishes, or the respondent admits, one of the following:
(1) that the merits of the factual dispute were not resolved in the State court hearing;
(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;
(3) that the material facts were not adequately developed at the State court hearing;
(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;
(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;
(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or
(7) that the applicant was otherwise denied due process of law in the State court proceeding;
(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record: ...

28 U.S.C. § 2254(d)

1  claim.).

2        Counsel testified that he began looking for Mr. Oliver and later discovered he was in

3  custody and under the influence. (Reporter's Transcript, August 9, 1996, 12, 16).[7]  Trial counsel

4  stated that he had personal knowledge of what Mr. Oliver was like even after a couple of days of

5  being under the influence, (RT 16), and that Mr. Oliver, counsel believed, had prior strikes in his

6  background and to incriminate himself in the way Petitioner thought he would might subject Mr.

7  Oliver to more strikes or possibly three-strikes, (RT 12).  As a result, counsel believed Mr. Oliver

8  would need counsel which would surely result in his not testifying on behalf of Petitioner.  (RT

9  12-13).  Counsel also testified that he considered all of these facts along with the fact that

10  Petitioner had also been charged with dissuading a witness and battery.  (RT 14).  Counsel stated

11  that he discussed all of these things with Petitioner and that Petitioner had agreed that Mr. Oliver,

12  in his condition, would not be a suitable witness for him. (RT 12, 16).

13        Petitioner's defense theory is contrary to all the other substantial evidence.  Petitioner was

14  identified by Ms. Poe as the one who stole the meat; he was captured on the surveillance video

15  (albeit a fuzzy one); he was wearing a tank top as described by Ms. Poe and pictured on the

16  video; he apprehended immediately outside the store with the merchandise and when first

17  approached apparently had it secreted in his pants as described by Ms. Poe; he made several

18  threatening remarks to market staff who approached him and tried to escape them; and he tried to

19  "play on [the] generosity" of the arresting officer by trying to escape. The conclusion that Mr.

20  Oliver would not testify in the manner Petitioner suggested was not unreasonable based upon his

21  condition and upon the fact that Mr. Oliver is also a "Three Striker."  Counsel's conclusion was

22  made after thought and discussion with Petitioner, under the facts and circumstances of the case

23  at the time, the court finds trial counsel's tactical decision reasonable.

24        Even assuming counsel's actions fell below the standard of reasonableness, Petitioner

25  cannot show prejudice.  To establish prejudice, Petitioner must establish "a reasonable

26  probability"- - that is, a "probability sufficient to undermine confidence in the outcome" - - that,

27

28        [7]All further references are to the Reporter's Transcript dated August 9, 1996, unless otherwise indicated.

1  but for counsel's deficient performance, "the result of the proceeding would have been different."

2  Strickland, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068 (1984). Whether an error actually

3  prejudiced a defendant is weighed against the "totality of the evidence before the judge or jury."

4  Id. at 695, 104 S.Ct. 2052. "[A] verdict or conclusion only weakly supported by the record is

5  more likely to have been affected by errors than one with overwhelming record support." Id. at

6  696, 104 S.Ct. 2052.

7      In the instant case, the jury's finding of guilt is supported by the record. Ms. Poe,

8  testified, through an interpreter, that she witnessed a man walking past the check out stand put

9  food in his pants. (RT 151). She then wrote a note to the cashier which read "I saw a black man

10 with a blue tank top that stole some meat." Id. Ms. Poe was then shown a series of photos in

11 which she identified herself and Petitioner by circling them. Id. She identified the man in the

12 photo as being the man who put the meat down his pants. (RT 153). Ms. Poe testified that

13 shortly after the man left the store, he was arrested. (RT 156). She testified that the same man

14 arrested was the individual she saw take the meat. Id. She further identified Petitioner at trial as

15 being the individual who she witnessed take the meat and leave the store. (RT 161, 162).

16     Petitioner testified that the man depicted in the store security photos were not him. (RT

17 176). However, Detective Salazar, the arresting officer, being familiar with both Petitioner and

18 Mr. Oliver, identified the man in the photos viewed by Ms. Poe as Petitioner and not Mr. Oliver.

19 (RT 199).

20     Manyeung Fung, Assistant Manager at R-N Market in Tulare, also testified that he was

21 alerted that a theft had taken place and was directed to the individual by the clerks and others as

22 having been the person who stole the meat. (RT 25). Mr. Fung testified that while following the

23 man identified by the clerks he saw that the man had nothing in his hands prior to crossing the

24 street. (RT 28). Upon reaching the other side, the Petitioner suddenly had items in his hands.

25 (RT 28). Mr. Fung approached Petitioner and found the items to be meat bearing labels from R-

26 N market. After being confronted by Mr. Fung and detained by staff members of the market,

27 Petitioner jumped up, hit Brandon Davis in the mouth and again ran away. (RT 34). Petitioner

28 was apprehended and detained by the men until the police arrived. (RT 34).

1    Petitioner also testified that he tried to return to the store to straighten the whole thing out

2    with Mr. Oliver. (RT 174).  However, Brandon Davis testified that the staff tried to get Petitioner

3    to return to the store but he refused to go back. (RT 94).

4    Petitioner provides the Court with an affidavit bearing the signature of one Charles

5    Oliver.  However, unlike the affidavit submitted by Ms. Toni Lyons, the Oliver affidavit bears no

6    date and was not signed in the presence of a notary public.  Moreover, even had Mr. Oliver

7    testified to the information provided in the affidavit, the additional information would not have

8    counteracted the weight of the testimony presented at trial.

9    The facts provided in the affidavit are also inconsistent with the testimony provided at

10   trial.  Such inconsistencies can raise serious questions about the credibility of the individual

11   advancing such facts.  As such, the statement does not support Petitioner's defense of mistaken

12   identity.  For example, the Oliver affidavit states, "After I got to the store I decided to take some

13   meat.  I took the meat and placed it into my waistband underneath my shirt.  While I was walking

14   around in the store, I saw two (2) friends named George Pope and Toni Lyons."  (Affidavit at 1).[8]

15   However, Ms. Poe, who witnessed the perpetrator put the meat in his pants, testified that after

16   having put the meat in his pants, the man immediately proceeded through the checkout stand

17   behind her and left the store. (RT 151, 152, 155).

18   The Oliver affidavit states that Mr. Oliver "informed [George] that Doug's car was

19   parked across the street in the gas station."  Petitioner testified, however, that he "was looking for

20   the car in the parking lot,"  (RT 171, 172, 186), and that he "didn't really know where he was in

21   the parking lot.  I just went out to take a look."   It is undisputed that Petitioner eventually made

22   it over to the gas station.  However, after approaching a vehicle and displaying the meat,

23   Petitioner walked away from the vehicle still carrying the meat. (41, 42).  Petitioner then denied

24   having any meat to staff  (RT 90), proclaimed that the meat belonged to him (rather than Mr.

25   Oliver) (RT 42, 74, 89), and finally argued that the meat wasn't even from the RN Market (RT

26   55, 74, 88).  Petitioner then fled. (RT 44, 76, 94, 102).

27

28
     ───────────────────────
        [8]The affidavit appears as the last document attached to the Petition.

                                                    24

1    Petitioner's defense that it was someone else who stole the meat is not credible in light of

2  the evidence introduced at trial.  Even assuming Mr. Oliver would have testified despite any

3  possible self-incrimination, his testimony would not have offset the testimony of an eyewitness

4  and several other witnesses.  Petitioner's attempts to escape and a successful escape following his

5  apprehension and failure to ever voice his defense prior to trial render his defense implausible.

6  Petitioner fails to show prejudice sufficient to constitute a Sixth Amendment violation.

7  Accordingly, the Court finds the trial court's decision with respect to this claim was neither

8  contrary to or an unreasonable application of clearly established federal law.

9        ***Ineffective Assistance of Appellate Counsel***

10    Petitioner next contends that he was denied the effective assistance of appellate counsel.

11  Namely because appellate counsel did not raise the issue of the use of the word "nigger," failing

12  to raise the issue of prosecutorial misconduct, and failing to pursue the issue the missing jury

13  notes even though he moved for augmentation of the transcript.

14    In support of his allegation, Petitioner submits two letters from his appellate attorney.

15  The first letter informs Petitioner of the status of his appeal.  The second is in response to

16  Petitioner's filings in the appeals court during the time in which counsel was also submitting

17  pleadings.

18    Effective assistance of appellate counsel is guaranteed by the Due Process Clause of the

19  Fourteenth Amendment.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective

20  assistance of appellate counsel are reviewed according to Strickland 's two-pronged test.  Miller

21  v. Keeney, 882 F.2d 1428, 1433 (9th Cir.1989); United States v. Birtle, 792 F.2d 846, 847 (9th

22  Cir.1986); See, also, Penson v. Ohio, 488 U.S. 75, 109 S.Ct. 346, 353-54 (1988) (holding that

23  where a defendant has been actually or constructively denied the assistance of appellate counsel

24  altogether, the Strickland standard does not apply and prejudice is presumed; the implication is

25  that Strickland does apply where counsel is present but ineffective).

26    To prevail, Petitioner must show two things.  First, he must establish that appellate

27  counsel's deficient performance fell below an objective standard of reasonableness under

28  prevailing professional norms.  Strickland v. Washington, 466 U.S. 668, 687-88, 104 S.Ct. 2052,

2064 (1984).  Second, Petitioner must establish that he suffered prejudice in that there was a

reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on

appeal.  Id. at 694.  A "reasonable probability" is a probability sufficient to undermine confidence

in the outcome.  Id.  The relevant inquiry is not what counsel could have done; rather, it is whether

the choices made by counsel were reasonable.  Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th

Cir.1998).  The presumption of reasonableness is even stronger for appellate counsel because he

has wider discretion than trial counsel in weeding out weaker issues; doing so is widely

recognized as one of the hallmarks of effective appellate assistance.  Miller v. Keeney, 882 F.2d

1428, 1434 (9th Cir.1989).  Appealing every arguable issue would do disservice to the Petitioner

because it would draw an appellate judge's attention away from stronger issues and reduce

appellate counsel's credibility before the appellate court.  Id.  Appellate counsel has no

constitutional duty to raise every nonfrivolous issue requested by petitioner.  Id at 1434 n10

(citing Jones v. Barnes, 463 U.S. 745, 751-54, 103 S.Ct. 3308 (1983)).

        In the instant case, Petitioner complains that appellate counsel failed to raise the issue of

the use of the word "nigger" by the trial judge.  As discussed above, the use of the word by the

trial judge was done in an effort to ensure Petitioner obtained an fair trial by excluding racially

biased individuals.  Thus, appellate counsel's decision not to pursue the issue on appeal was

reasonable.  Moreover, the failure of counsel to pursue this issue did not result in prejudice.  In

light of the record and the context in which the term was used, it is not reasonably probable that

Petitioner would have prevailed on appeal had counsel pursued this issue.

        Petitioner's contention that appellate counsel was deficient for failing to raise the

allegations of prosecutorial misconduct also fails.  As noted above, the prosecutor's commentary

regarding the security photos and the defense failure to call exculpatory witnesses was not

improper and within the law.  Counsel's decision not to raise a meritless issue was within the

expected range of competency as appellate counsel is under no obligation to raise nonmeritorious

arguments.  Shah v. United States, 878 F.2d 1156, 1162 (9th Cir.1989) (failure to raise a meritless

legal argument does not constitute ineffective assistance of counsel); Boac v. Raines, 769 F.2d

1341, 1344 (9th Cir.1985)(same).  As such, appellate counsel's decision was reasonable and

1  Petitioner's claim fails.

2       Finally, Petitioner's assertion that appellate counsel was ineffective for not having further

3  pursued the issue of obtaining the jury notes.  As noted by Respondent, the Court granted

4  Petitioner's Motion to Augment the Record with the notes. (Appendix K).  However, neither the

5  court reporter or the superior court clerk were able to provide any further information about the

6  existence of the jury notes in the case. (Appendices L and M).  Appellate counsel also contacted

7  Petitioner's trial counsel regarding the notes and trial counsel informed him that any such

8  inquiries or responses by the judge would have irrelevant to the issues in the case.  (Appendix O,

9  Answer).  It appears from the record that appellate counsel did all he could in an effort to obtain

10  the notes.  Only following a determination that the notes were not available, did counsel file a

11  brief. (Exhibit 2, Petition).  Under the circumstances, appellate counsel's decision not to pursue

12  the matter further was within the range of competence and there is no reasonable probability that,

13  but for counsel's failure to pursue the issue on appeal, Petitioner would have prevailed.

14              ***Voir Dire About Petitioner's Criminal Record***

15       While the issue is not raised as a claim in the petition in the Post Evidentiary Hearing

16  Brief Petitioner's counsel argues that the trial judge's mention of Petitioner's criminal record in

17  *voir dire* was inappropriate and violated his right to an impartial trial.  It is clear from the record

18  that the trial judge was informed prior to *voir dire* that defendant would be testifying in his own

19  behalf and thus would be impeached with his prior convictions.  Asking questions in *voir dire*

20  about whether prospective jurors could be fair under such circumstances is not error much less a

21  violation of Petitioner's right to a fair trail.  Indeed Petitioner's trial counsel stated he wanted the

22  prospective juror to know that this was a "Three Strikes" case and that if convicted Petitioner

23  would be sentenced to 25 years to Life for stealing meat.

24  /////

25  /////

26  /////

27  /////

28  /////

/////

### CONCLUSION

The Court finds the state court's adjudication of Petitioner's claims did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence.  28 U.S.C. § 2254(d); See, Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000).

Accordingly, the Court HEREBY ORDERS:

1.      The Petition for Writ of Habeas Corpus is DENIED;

2.      The Clerk of Court is DIRECTED to enter judgment in favor of Respondent.


IT IS SO ORDERED.

**Dated:    January 11, 2005                                     /s/ Dennis L. Beck                        **
#                                      UNITED STATES MAGISTRATE JUDGE